UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

RONALD LEE ASHWORTH,          CIVIL ACTION
    Appellant                NO. 1:11-CV-01786

VERSUS

U.S. COMMISSIONER OF SOCIAL     JUDGE JAMES T. TRIMBLE
SECURITY,                MAGISTRATE JUDGE JAMES D. KIRK
    Appellee

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Ronald Lee Ashworth ("Ashworth") filed an application for disability insurance benefits ("DIB") on September 19, 2007, when he was 38 years old, alleging a disability onset date of August 13, 2002[1] (Tr. p. 77) due to "ruptured disc in lower back, three back surgeries" (Tr. p. 90). That application was denied by the Social Security Administration ("SSA") (Tr. p. 46).

A de novo hearing was held before an Administrative Law Judge ("ALJ") on March 6, 2009, at which Ashworth appeared with his attorney and a vocational expert ("VE") (Tr. p. 21). The ALJ found that, although Ashworth suffers from a severe impairment, "disorders of the lumbar spine," he has the residual functional capacity to perform sedentary work except that he needs the opportunity to alternate sitting and standing once each hour, can

---

[1] Although Ashworth alleged in his application that his disability onset was December 23, 1997, his attorney verbally amended that date at his administrative hearing to August 13, 2002 (Tr. pp. 24, 25). Also, Ashworth filed a previous application for DIB in 2000, which was denied by the ALJ on May 31, 2002 (Tr. p. 24).

only push and pull within the limits of lifting and carrying, and can only engage in occasional postural movements except for never climbing ropes, ladders or scaffolds (Tr. p. 15). The ALJ concluded that Ashworth can work as a food and beverage order clerk, a telephone quotation clerk, or a surveillance system monitor, and therefore was not disabled at any time from August 13, 2002 through December 31, 2002, the date he was last insured (Tr. pp. 15, 18-19).

Ashworth requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Ashworth next filed this appeal for judicial review of the Commissioner's final decision. Ashworth raises the following grounds for relief on appeal:

> 1. The ALJ failed to properly find Ashworth is disabled under Listing 1.04, "Disorders of the Spine."
>
> 2. The ALJ failed to properly perform a function by function assessment of Ashworth's residual functional capacity by failing to discuss all of Ashworth's exertional and non-exertional limitations in accordance with 20 C.F.R. § 404.1545, § 416.945, and S.S.R. 96-8p.
>
> 3. The ALJ failed to give legitimate reasons for questioning Ashworth's credibility regarding his pain, in accordance with S.S.R. 96-7 and S.S.R. 88-13.
>
> 4. The ALJ failed to review new material evidence that was not available to the ALJ at the time of hearing, specifically, a statement by plaintiff's treating physician, Dr. Frank Lopez, stating his condition and limitations.

<u>Eligibility for DIB</u>

To qualify for disability insurance benefits, a plaintiff must

meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment existing in the national economy. 42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

1. Medical Evidence

Ashworth, a 28 year-old pipe fitter, suffered a back injury at work in October 1997, which caused a disc herniation at L4-5 with radiculopathy that was unresponsive to conservative treatment (Tr. pp. 133-135). Ashworth underwent a partial lumbar laminectomy at L4-5 in December 1997 with Dr. Clark A. Gunderson, an orthopedic surgeon, then suffered a second herniation at L4-5 and had a second partial laminectomy at L4-5 in May 1998, followed by physical therapy (Tr. pp. 145-147, 274). In January 1999, due to continued pain, Ashworth underwent an additional laminectomy with fusion at L4-5, again followed by physical therapy (Tr. pp. 142-144).

Ashworth continued to have pain, and was referred for pain management (Tr. p. 274). In March 2000, Ashworth had a myelogram and a CT scan that did not show any significant abnormality (Tr. p.

3

279). Dr. Gunderson found Ashworth probably had a pseudoarthrosis and advised him to have a laminectomy and fusion with pedicle screws (Tr. p. 279).

Ashworth had an occupation and physical therapy functional capacity evaluation in July 2000 (Tr. p. 273). Ashworth reported that his fusion had failed and another surgery had been recommended, but Ashworth refused to undergo another surgery (Tr. p. 274). Ashworth was found to be functioning at a sedentary work level (Tr. p. 273). The therapists found that Ashworth should only occasionally climb, stoop, work at elevations, or crouch, and should only very occasionally kneel (Tr. p. 278).

Ashworth was evaluated by Dr. Gunderson in March 2002 (Tr. pp. 149-150, 228-229). Dr. Gunderson found Ashworth's posture and gait were normal, he could dress and undress without difficulty, had very little motion and could flatten his lumbar curvature to 24 inches from the floor, had a normal motor and reflex examination, and his straight leg raising caused back pain at 40° bilaterally (Tr. p. 149). Ashworth complained of a rocking sensation in his lower back, tenderness about the healed scar, and lower back pain radiating down his right leg to his foot (Tr. p. 149). X-rays of the lumbar spine showed the interbody cages at L4-5 with no other apparent pathology (Tr. p. 149). Dr. Gunderson stated that it was his impression that Ashworth's complaints were related to pseudoarthrosis[2] in the interbody cages, and noted there was no

---

[2] Pseudoarthrosis is an abnormal union formed by fibrous tissue between parts of a bone that has fractured, usually spontaneously, due to congenital weakness—called also "false

4

definite motion on flexion extension or lysis around the cages (Tr. p. 149).  Dr. Gunderson told Ashworth he could continue as he was or undergo a posterolateral fusion with pedicle screws (Tr. p. 149).

Ashworth was evaluated by Dr. Erich Wolf, a neuro-surgeon, in July 2002 (Tr. pp. 165-168).  Dr. Wolf found low back pain, mild right sciatic notch tenderness, positive weight relief, positive straight leg raises on the right and left at 50°, severe bilateral muscle spasms in his spine, severely limited lumbar spine flexion and extension with low back pain bilaterally, and radicular pain in both lower extremities (Tr. p. 167).  Dr. Wolf diagnosed post-laminectomy syndrome,[3] lumbago,[4] and pseudoarthrosis causing severe lumbar and radicular pain, and recommended more tests (Tr. pp. 167-168).

An MRI of Ashworth's lumbosacral spine in August 2002 showed

---

joint."  MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Pseudoarthrosis, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).
  A pseudoarthrosis is a non-healed fusion.  MEDLINEplus Health Information, Medical Encyclopedia (service of the U.S. National Library of Medicine and the National Institutes of Health).

[3] Failed Back Syndrome, or "Post-Laminectomy Syndrome," refers to chronic back and/or leg pain that occurs after back (spinal) surgery.  American Academy of Spine Physicians, "Failed Back Syndrome ("Post-Laminectomy Syndrome"), available at http://www.spinephysicians.org/dr0sdodetail.cfm?id=21.

[4] Lumbago is acute or chronic pain in the lower back. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Lumbago, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

his anterior interbody cage fusion at L4-5 and laminectomy with satisfactory alignment and position; no abnormal motion was identified (Tr. p. 159). An MRI of Ashworth's lumbar showed L4-5 anterolateral epidural fibrosis,[5] spondylosis,[6] and bilateral minimal neural canal stenosis[7] (Tr. p. 159).

In November 2002, Ashworth reported the same sharp, burning low back and bilateral leg pain to Dr. Wolf (Tr. pp. 163-164). Dr. Wolf noted the MRI showed severe epidural fibrosis at L4-5 and the plain x-rays did not show any appreciable movement at that level (Tr. p. 164). Dr. Wolf diagnosed post-laminectomy syndrome, lumbar, and lumbago, and recommended spinal cord stimulation (Tr.

---

[5] Epidural fibrosis (EF) is defined as nonphysiologic scar formation, usually at the site of neurosurgical access into the spinal canal, in intimate vicinity to and around the origin of the radicular sheath. From the very onset, EF behaves as a reparative inflammation causing, as a rule, clinical problems of characteristic nature and dynamism (pain). Clin J Pain. 2009 Sep;25(7):600-6, "Postoperative epidural fibrosis," *available at* MEDLINEplus Health Information, http://www.ncbi.nlm.nih.gov/ pubmed/19692802 (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[6] Spondylosis is any of various degenerative diseases of the spine. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Spondylosis, *available at* http://www.nlm.nih.gov/ mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[7] Spinal stenosis causes narrowing in your spine. The narrowing can occur at the center of your spine, in the canals branching off your spine and/or between the vertebrae, the bones of the spine. The narrowing puts pressure on your nerves and spinal cord and can cause pain. Symptoms might appear gradually or not at all. They include pain in your neck or back, numbness, weakness or pain in your arms or legs, and foot problems. Treatments include medications, physical therapy, braces and surgery. MEDLINEplus Health Information, Medical Encyclopedia: Spinal stenosis, *available at* http://www.nlm.nih.gov/medlineplus/ spinalstenosis.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

6

p. 1534).

In January 2003, Ashworth reported a deep, burning pain; Dr. Wolf noted that Ashworth's gait was normal, his reported bilateral lumbar region pain was unchanged, and he recommended that Ashworth use a TENS unit (Tr. pp. 161-162).

In July 2004, Ashworth saw Dr. Gunderson for an annual evaluation (Tr. p. 226). Dr. Gunderson found Ashworth had increased pain when walking, standing or sitting, and decreased pain when lying down (Tr. p. 226). An MRI in August 2004 showed some residual disc bulging or osteophytic ridging at L4-5 with some neural canal narrowing bilaterally, but no central canal compromise was seen, and mild hypertrophic changes of the facets bilaterally at L2-3 without focal disc protrusion, central canal stenosis, or neural canal narrowing (Tr. p. 217).

In February 2006, Dr. James Perry, an orthopedic surgeon, examined Ashworth and found no evidence of instability in his cages, his gait was normal, and his motor examination was normal, diagnosed chronic lower back pain, and concluded Ashworth had reached maximum medical improvement and should not do more than sedentary type work (Tr. pp. 172-174).

In May 2006, Dr. Gunderson ordered a functional capacity evaluation on Ashworth (Tr. pp. 176-191). Ashworth was 6 feet tall, weighed 217 pounds, and was able to perform light level work with the conditions that he be allowed to stand after every 30 to 45 minutes of sitting, be allowed to sit after every 15 to 30 minutes of standing, avoid walking more than occasionally

(intermittently), limit walking distances to 500 feet or less at a time, avoid deep squatting/crouching, avoid stooping, avoid repetitive or prolonged maintenance of lumbar extension, lateral flexion, and rotation, avoid climbing stairs/ladders, limit lifting/carrying to light levels, and avoid lifting from floor to knuckle or shoulder to overhead (Tr. pp. 186-190). It was also stated that Ashworth may not be able to return to work on a full time basis, and recommended that, if he returned to work, he should begin working on a limited time basis (2 to 4 hours per day), and should try some form of home employment (Tr. p. 190).

A January 2008 MRI showed Ashworth had a minimal broad based disc bulge at L3-4 with no evidence of disc herniation or central canal stenosis, the neural foramina appeared to be widely patent, and there was a mild enhancing epidural scar formation at L4-5 with no evidence of a recurrent disc herniation or central canal stenosis (Tr. p. 215). There was no significant change from the August 2004 MRI (Tr. p. 215).

In February and March 2008, Dr. Gunderson stated that Ashworth could perform sedentary work (Tr. p. 220), and recommended lumbar epidural steroid injections (Tr. p. 221). In April 2008, Dr. Gunderson gave Ashworth a lumbar epidural steroid injection (Tr. p. 270).

Also in 2008, Dr. Frank W. Lopez, a physical medicine and rehabilitation specialist, did nerve conduction studies on Ashworth and found no atrophy, edema, discoloration or deformity, but there was tenderness bilaterally at the lumbar levels, a decreased range

of motion due to pain, and straight leg raises were painful bilaterally (Tr. p. 317). Dr. Lopez found chronic denervation signs and prolonged latencies consistent with chronic radiculopathies at the lumbar levels (Tr. p. 318). Throughout 2008, Dr. Lopez found Ashworth's gait was antalgic, diagnosed low back pain and failed back surgery syndrome with radiculopathy in the lower extremities (Tr. pp. 314-322).

In January 2009, Dr. Alan J. Ostrowe, a pain management doctor, also noted Ashworth's antalgic gait,[8] found he had reached maximum medical improvement if no further action is taken, and he does not need further surgery unless he starts exhibiting severe mechanical instability (Tr. pp. 333-339). Dr. Ostrowe further stated that his prognosis for Ashworth's return to the work force was extremely limited unless there was further intervention or change in his medications, and noted several possible changes for his medications (Tr. p. 338).

In May 2009, Dr. Wolfe wrote that Ashworth's low back pain causes him to lie down at least three hours a day on several days a week, he has difficulty maintaining concentration, it is difficult for him to sit or stand more than thirty minutes at a time, he would require extra breaks if he had a sit-down job, he has "bad days" that would interfere with his ability to work at least one day a week on average, and he has had these same

---

[8] An "antalgic gait" is a limp in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side. The American Heritage Stedman's Medical Dictionary (2002 Houghton Mifflin Co.).

limitations since December 23, 1997 (Tr. pp. 360-361).

### 2. Administrative Hearing

At his March 2009 administrative hearing, Ashworth testified that he was 39 years old, 6' tall, and weighed about 220 pounds (Tr. p. 25). Ashworth testified that he lives with his wife and four children, completed the tenth grade, earned a GED, and completed pipe fitter's school (five years) (Tr. p. 26). Ashworth last worked in 1997 as a pipe fitter (Tr. pp. 26-27). Ashworth testified he ruptured a disc in his back in December 1997, when he lifted a six inch valve at work (Tr. p. 27). Ashworth testified that Worker's Compensation stopped paying benefits in January 2008 (Tr. p. 28). Ashworth testified that his sole source of income is from his wife's work income (Tr. p. 28).

Ashworth testified that he has pain in his lower back and both legs which is worse when he stands, walks, or sits in one position for too long (Tr. p. 28). Ashworth testified that his pain is a little better when he lies down (Tr. p. 29).

Ashworth testified that, on a normal week day, he takes his children to school, sometimes goes to the store and talks with friends for about an hour, then returns home and lies around (Tr. p. 29). Ashworth testified that he cannot lift a grocery bag, does not do yard work, is no longer able to fish, and has trouble sleeping sometimes if he is hurting too much, but he sometimes washes a few dishes, watches TV, and can drive short distances (Tr. pp. 29-30).

Ashworth testified that Dr. Gunderson performed all three of

10

his back surgeries, and he currently sees Dr. Lopez for pain management and a family doctor for high blood pressure and high cholesterol (Tr. p. 30). Ashworth testified that he last saw Dr. Gunderson in 2008 (Tr. p. 31). Ashworth testified that he takes Mepergan Fortis for pain, Cymbalta, Tranzene, Nexium, Lyrica, Benicar, and Lipitor (Tr. pp. 30-31). Ashworth testified that his pain medications alleviate his pain but cause him to be drowsy and sleep a lot (Tr. pp. 31, 35); sometimes his medication knocks him out (Tr. p. 35). Ashworth testified that he cannot always take his pain medication only at night (Tr. p. 36). Ashworth testified that he sometimes takes naps during the day due to drowsiness caused by his medication or due to lack of sleep at night (Tr. p. 36). Ashworth testified that he has trouble functioning when he takes Mepergan because it makes him groggy and drowsy (Tr. p. 36).

Ashworth testified that he hurts badly if he walks two aisles at WalMart, and lifting a gallon of milk hurts, but he can stand for 20 to 30 minutes and sit 30 to 45 minutes (Tr. p. 31). Ashworth also testified that he does not have problems getting along with other people (Tr. p. 32). Ashworth testified that he cannot work due to severe back and leg pain and limited mobility (Tr. p. 32).

Ashworth testified that he has nearly constant pain radiating down into his legs, as well as numbness, tingling, and weakness (Tr. p. 33). He hurts worse and does not sleep well when cold fronts pass through or if the temperature is hot (Tr. p. 35). Ashworth testified that his leg pain affects his concentration (Tr.

11

p. 33).  On a good day, Ashworth has less pain (Tr. p. 34).  On bad days, Ashworth lies around a lot; he has more bad days than good days (Tr. p. 34).  Ashworth testified that he does not think he could work all day on a bad day, even with alternating sitting and standing (Tr. p. 35).

Ashworth testified that these problems have been consistent since he stopped working and were the same in August 2002 (Tr. p. 37).

The VE testified that Ashworth's past work as a painter's helper was medium and unskilled, his past work as a pipe fitter's helper was heavy with SVP[9] 3 (lower level semi-skilled), and his past work as a pipe fitter was heavy with SVP 7 (skilled) (Tr. p. 39).  The VE testified that Ashworth does not have any transferable skills (Tr. p. 39).

The ALJ posed a hypothetical involving a person of Ashworth's age, education, and vocational experience, who is limited to sedentary work with the additional limitations of unskilled work with the opportunity to alternate sitting and standing once an hour (Tr. p. 39).  The VE testified that such a person would not be able

---

[9] SVP, or Specific Vocational Preparation, refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a particular occupation. See DICTIONARY OF OCCUPATIONAL TITLES ("DOT") app. C (rev. 4th ed.1991). Unskilled work usually requires less than thirty days training, which corresponds to an SVP of 1 or 2; semi-skilled work corresponds to an SVP of 3 or 4; and skilled work requires an SVP level of 5 or higher. SSR 00-4p, 2000 WL 1898704, at *3 (S.S.A. Dec. 4, 2000).

to return to his past relevant work, but could work as a food and beverage order clerk (260 jobs in Louisiana, 27,600 jobs nationally), a telephone quotation clerk (1000 jobs in Louisiana, 75,000 jobs nationally), or a surveillance system monitor (1000 jobs in Louisiana, 50,000 jobs nationally) (Tr. pp. 39-40).  If the person had to miss work on an irregular basis, "up to at least three days a month," there are no jobs such a person would be able to perform (Tr. p. 40).

The VE also testified that, if the person had to lie down sometimes in the afternoon (for any length of time) to alleviate pain, there are no jobs such a person could perform (Tr. p. 41). The VE testified that, alternatively, if the person had to take 10 minute breaks every hour due to pain or the side effects of medication, for an average total of one hour per day outside of normal breaks, that person would not be able to maintain employment (Tr. p. 42).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Ashworth (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential

13

process ends.   A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.   Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.   Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Ashworth has not engaged in substantial gainful activity since his alleged onset date of August 13, 2002 through the date he was last insured, on December 31, 2002 (Tr. p. 14), and that he has a severe impairment of disorders of the lumbar spine, but he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 14).   The ALJ also found that Ashworth is unable to perform his past relevant work as a pipe fitter (Tr. p. 18).

At Step No. 5 of the sequential process, the ALJ further found that Ashworth has the residual functional capacity to perform the full range of sedentary work except for his need to alternate sitting and standing once each hour, he can only push and pull within the limits of lifting and carrying, he can only engage in

14

occasional postural movements, he can never climb ropes, ladders or scaffolds, and he must do unskilled work (Tr. p. 15).  The ALJ found that claimant is a younger individual with a high school education (Tr. p. 18).  The ALJ concluded there are a significant number of jobs in the national economy which Ashworth can perform, such as food and beverage order clerk, telephone quotation clerk, and surveillance system monitor (Tr. p. 19) and, therefore, Ashworth was not under a "disability" as defined in the Social Security Act at any time through the date he was last insured on December 31, 2002 (Tr. p. 19).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly

15

detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### Law and Analysis

Issue 1 - Listing 1.04

Ashworth contends the ALJ failed to properly find Ashworth is disabled under Listing 1.04(A) because his August 2002 MRI revealed spondylosis and spinal stenosis.

A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1.  Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92 (1990).  Also, Selders v. Sullivan, 914 F. 2d 614, 619 (5th Cir. 1990).  Where the impairment

16

is severe, the Commissioner must determine whether the impairment is so severe that the claimant will be presumed to be disabled. This determination is made by comparing the impairment to a specific Listing of Impairments in the SSA regulations. See 20 C.F.R. § 404, Subpart P, Appendix 1. If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987). Also, Selders, 914 F.2d at 619 n. 1. A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan,, 110 S.Ct. at 891-92. Also, Selders, 914 F. 2d at 619. For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. Sullivan, 493 U.S. 521, 110 S. Ct. at 891.

The ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he/she reached the conclusion that the claimant's symptoms are insufficiently severe to meet any listed impairment. A bare and summary conclusion that a plaintiff does not meet the criteria of any listing is beyond meaningful judicial review. Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007), and cases cited therein.

Listing 1.04(A) states:

1.04. Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

17

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness, or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

In March 2002, Ashworth complained of lower back pain radiating down his right leg to his foot; Ashworth's posture and gait were normal, he could dress and undress without difficulty, he had a normal motor and reflex examination, and straight leg raising caused back pain at 40° bilaterally (Tr. p. 149). In July 2002 Ashworth had low back pain, mild right sciatic notch tenderness, positive weight relief, positive straight leg raises on the right and left at 50°, severe bilateral muscle spasms in his spine, severely limited lumbar spine flexion and extension with low back pain bilaterally, and radicular pain in both lower extremities (Tr. pp. 165-168). An MRI in August 2002 showed his anterior interbody cage fusion at L4-5 and laminectomy with satisfactory alignment and position; no abnormal motion was identified (Tr. p. 159). An MRI of Ashworth's lumbar back showed L4-5 anterolateral epidural fibrosis, spondylosis and bilateral minimal neural canal stenosis. An MRI in August 2004 showed no central canal stenosis. A January 2008 MRI showed no evidence of central canal stenosis L4-5.

Ashworth has not carried his burden of proving that he meets Listing 1.04(A). The only evidence of spinal stenosis is from a 2002 MRI, which showed mild spinal stenosis, and there is no evidence that Ashworth had any motor loss between August 13, 2002 and December 31, 2002. Therefore, substantial evidence supports

the ALJ's/Commissioner's finding that Ashworth does not meet Listing 1.04(A).

## Issue No. 2 - Residual Functional Capacity Assessment

Next, Ashworth contends the ALJ failed to properly perform a function by function assessment of Ashworth's residual functional capacity by failing to discuss all of Ashworth's exertional and non-exertional limitations in accordance with 20 C.F.R. § 404.1545, § 416.945, and S.S.R. 96-8p.

A claimant's impairments may cause physical or mental limitations that affect what he can do in a work setting. Residual functional capacity is a medical assessment, based upon all of the relevant evidence, of the work a claimant can perform despite his or her limitations. 20 C.F.R. §404.1545, §416.945. Although the burden of proof in a disability case is on the claimant to show that he is unable to perform his usual line of work, once that fact is established, the burden shifts to the Commissioner to show that the claimant is able to perform some other kind of substantial work available in the national economy. Herron v. Bowen, 788 F. 2d 1127, 1131 (5th Cir. 1986), and cases cited therein. Also, Babineaux v. Heckler, 743 F.2d 1065, 1067 (5th Cir. 1984). The Commissioner has the burden to establish a claimant's residual functional capacity. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

For cases at the administrative law judge hearing level, the ALJ has the responsibility for deciding a claimant's residual functional capacity. 20 C.F.R. § 404.1546, § 416.946. The ALJ

must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination.   SSR 96-8p.   When making the RFC determination an ALJ must consider objective medical facts, diagnoses and medical opinion based on such facts, and subjective evidence of pain or disability testified to by the claimant or others.   20 C.F.R. § 404.1545(a).   Moreover, the ALJ must specify the evidentiary basis for his RFC determination.   SSR 96-8p.   <u>Myers v. Apfel</u>, 238 F.3d 617, 620 (5th Cir. 2001).

In the case at bar, the ALJ stated (Tr. pp. 17-18):

"In reference to SSR 96-7p consideration has been given to the claimant's allegations of pain and dysfunction as a result of the medically determinable impairment.  Based on the evidence in the record, the requisite relationship between the medically determinable impairment (MDI) and the alleged limitations is established.  However, while the claimant does have a severe MDI, after quantifying and cross referencing the degree of abnormality of the objective physical findings and diagnostic testing with the level of function reported by the claimant, the undersigned finds that the intensity, severity and persistence as well as the functionally limiting effects of the alleged limitations, are disproportionate to that expected for the established MDIs.  The undersigned's conclusion is founded on the objective evidence available and the totality of the record as a whole.  The claimant alleges that he is unable to walk, stand or lift secondary to his back problem.  However, the claimant's own treating source's past assessment, the prior Functional Capacity Evaluation and the claimant's own testimony confirm that the claimant had and retains the ability to stand and walk for short intermittent periods of time throughout the work day.  He is able to lift 5 to 20 pounds and is able to sit intermittently throughout the work day if given the opportunity to change positions.   The claimant's daily routine included activities that required him to stand and sit continuously throughout the day.   Therefore, the undersigned has deduced that the claimant's allegations of pain and functional limitations, as a result of the MDIs, are not fully credible.

20

"In summary, the medical evidence supports the existence of severe impairments that cause some functional restrictions, however, the impairments singularly or in combination do not restrict the claimant from performing normal activities or from completing normal routine tasks."

Ashworth contends the ALJ failed to specify the frequency and duration of his need to alternate sitting and standing. However, the ALJ specified in his conclusion that Ashworth needs to be able to alternate sitting and standing once each hour (Tr. p. 15). The duration of the sitting and standing was, obviously, left up to Ashworth, and did not limit Ashworth to any specific amounts of time spent in either position. The ALJ's finding that Ashworth could do sedentary work, i.e. stand/walk up to two hours in an eight hour day and sit for up to six hours in an eight hour day, was only a general guideline as to his overall abilities, which the ALJ further restricted. Thus, if Ashworth decides to sit for an entire hour, or stand for an entire hour, those options are also available to him under the ALJ's findings. Therefore, the ALJ was adequately specific as to frequency and duration of Ashworth's sitting and standing changes.

Ashworth further contends the ALJ failed to perform a "function-by-function assessment" of his nonexertional limitations and failed to include any non-exertional limitations in his assessment, such as reduced concentration, persistence, or pace.

In 2000, a functional capacity evaluation showed Ashworth was functioning at a sedentary work level. In February 2006, Dr. Perry concluded he should not do more than sedentary type work. In May 2006, the recommendation from a functional capacity evaluation was

that Ashworth may not be able to return to work on a full time basis, but if he returned to work he should begin working on a limited time basis (2 to 4 hours per day) and should try some form of home employment (Tr. p. 190).

Although the evidence appears to support the ALJ's finding that, physically, Ashworth could perform sedentary level work in 2002, Ashworth contends the ALJ did not consider the effects of his medication on his ability to work. Ashworth is correct. The ALJ never mentioned Ashworth's medications or their side effects. The regulations applicable to the Social Security Act establish that the ALJ must consider medication side effects when evaluating a claimant's symptoms. 20 C.F.R. § 404.1529(c)(3)(iv). Ashworth contends his medications affect his ability to concentrate as well as his persistence and pace.

SSR 96-8p provides that a residual functional capacity (RFC) "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." 1996 WL 374184, *1 (S.S.A.1996). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001). Social Security Ruling 96-7p, on credibility determinations, denotes the "kinds of evidence," including the above factors, that must be considered, but there is no instruction that every factor must be discussed in detail in the determination. Of course the ALJ's determination decision cannot simply make conclusory statements regarding credibility and "must

22

contain specific reasons for the finding on credibility, supported by the evidence in the case record. <u>Giles v. Astrue</u>, 433 F3d.Appx. 241, **7 (5th Cir. 2011).  S.S.R. 96-7p states that one of the factors the adjudicator must consider when assessing a claimant's credibility is the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms.

In the case at bar, the ALJ did not mention Ashworth's medications or their side effects, or state that he had considered the medication side effects and claimant's complaints of impaired concentration, persistence and pace.  Ashworth testified that he takes Mepergan Fortis for pain, Cymbalta, Tranxene, Nexium, Lyrica, Benicar, and Lipitor (Tr. pp. 30-31).  Ashworth testified that his pain medications alleviate his pain but cause him to be drowsy and sleep a lot, sometimes "knock him out," and make it difficult to function (Tr. pp. 31, 35, 36).

It is noted that Mepergan Fortis is made of meperidine and promethazine; meperidine is a narcotic analgesic used to relieve moderate to severe pain, and can cause weakness, dizziness and confusion.  Promethazine controls nausea and allergic reactions, and can cause drowsiness, listlessness, dizziness, and loss of coordination.  MEDLINEplus Health Information, Drug Information: Meperidine and Promethazine, *available at* <u>http://www.nlm.nih.gov/medlineplus/druginfo/medmaster</u> (a service of the U.S. National Library of Medicine and the National Institutes of Health).  Lyrica, or Pregabalin, is also a pain medication that can cause

23

tiredness, difficulty concentrating, forgetfulness, lack of coordination, and weakness.  MEDLINEplus Health Information, Drug Information: Pregabalin, *available at* http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster (a service of the U.S. National Library of Medicine and the National Institutes of Health).

Ashworth's complaints of drowsiness and difficulty functioning could be caused by the medications he takes.  The ALJ failed to mention Ashworth's medications and his complaints of medication side effects, and failed to either incorporate the side effects into his hypothetical question to the VE or state why he did not find Ashworth's complaints as to side effects credible.  Therefore, although the ALJ need not discuss every factor he considers, Ashworth's medication side effects appear to have been relevant to the issue of his ability to work, and it does not appear the ALJ considered Ashworth's medication side effects at all.

Since the ALJ did not consider the side effects of Ashworth's medications and their effect on his ability to work, substantial evidence does not support the ALJ's finding that Ashworth is not disabled.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law.  However, this does not entitle Ashworth to a decision in his favor based upon the existing record.  The record is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the national economy which Ashworth can perform, given his true impairments.

24

Therefore, Ashworth's case should be remanded to the Commissioner for further proceedings.

Issue 3 - Pain

Next, Ashworth contends the ALJ failed to give legitimate reasons for questioning Ashworth's credibility regarding his pain, in accordance with S.S.R. 96-7 and S.S.R. 88-13.

Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged. The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence. Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989), citing Owens v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985). The factual determination of whether the claimant is able to work despite some pain is within the discretion of the Administrative Law Judge and will be upheld if supported by substantial evidence. Fortenberry v. Harris, 612 F.2d 947, 950 (5th Cir. 1980).

A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §404.1529(c)(4); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2000). Although severe pain can constitute a

25

nonexertional impairment, pain is a disabling condition only when it is constant, unremitting and wholly unresponsive to therapeutic treatment. Chambliss, 269 F.3d at 522.

While pain can be severe enough to create a disabling condition, the evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. Elzy v. Railroad Retirement Bd., 782 F.2d 1223, 1225 (5th Cir. 1986); Loya v. Heckler, 707 F.2d 211, 215 (5th Cir. 1983). The ALJ's decision on the severity of pain is entitled to considerable judicial deference. James v. Bowen, 793 F.2d 702, 706 (5th Cir. 1986); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). Also, Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 128-29 (5th Cir. 1991). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. Falco v. Shalala, 27 F.3d 162, 163-64 (5th Cir. 1994).

The ALJ's findings as to Ashworth's pain and credibility are set forth above, in the previous section. Since the ALJ made the mandatory indication of the basis for his credibility choices concerning claimant's complaints, and since his choices are not unreasonable, his finding that Ashworth's pain would not prevent Ashworth from performing work is proper. Carry v. Heckler, 750 F.2d 479, 485-86 (5th Cir. 1985). Substantial evidence supports the Commissioner's conclusion that Ashworth is not disabled by

pain.

Issue 4 - New Evidence

Finally, Ashworth contends the ALJ failed to review new, material evidence that was not available to the ALJ at the time of hearing, specifically, a statement by plaintiff's treating physician, Dr. Frank Lopez, stating his condition and limitations.[10]

The ALJ did not err. The "medical statement" from Dr. Lopez is dated May 21, 2009 (Tr. pp. 360-361). The ALJ's decision was signed on April 17, 2009 (Tr. p. 20). The ALJ could not have reviewed evidence that was submitted after the date of his decision. This issue is meritless.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Ashworth's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the

---

[10] Ashworth does not raise the issue of whether the Appeals Council should have reviewed the evidence. It is noted that the Appeals Council stated it considered the new evidence and found it did not provide a basis for changing the ALJ's decision (Doc. 1).

District Judge at the time of filing.   Timely objections will be considered by the district judge before he makes a final ruling.

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _5th_ day of September 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE